**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | | |
|---|---|---|
| STEPHANIE MILLER and MARY ALYCE DAWSON, individually, and on behalf of all others similarly situated, | ) ) ) | Case No.  1:17-cv-00763-DAP |
| | ) | |
| Plaintiffs, | ) | Judge Dan Aaron Polster |
| | ) | |
| v. | ) | Magistrate Judge David A. Ruiz |
| | ) | |
| INTELEOS, INC., an Ohio Corporation, f/k/a the AMERICAN REGISTRY OF DIAGNOSTIC MEDICAL SONOGRAPHY, INC., | ) ) ) ) | |
| | ) | |
| Defendant. | ) | |

**PLAINTIFFS' MOTION FOR FINAL APPROVAL OF A CLASS
ACTION SETTLEMENT AGREEMENT AND MEMORANDUM
OF POINTS AND AUTHORITIES IN SUPPORT THEREOF**

Thomas A. Zimmerman, Jr.
(admitted *pro hac vice*)
ZIMMERMAN LAW OFFICES, P.C.
77 W. Washington Street, Suite 1220
Chicago, Illinois 60602
(312) 440-0020

Marc E. Dann 0039425
THE DANN LAW FIRM CO., LPA
P.O. Box. 6031040
Cleveland, Ohio 44103
(216) 373-0539

*Settlement Class Counsel*

## TABLE OF CONTENTS

I.  NATURE OF THE LITIGATION AND PROCEDURAL HISTORY ........................1

II.  SUMMARY OF THE SETTLEMENT ...............................................................3

III.  THE RESULTS OF THE SETTLEMENT ........................................................5

    A.  The Likely Payments to Subclass 1 Members ......................................5

    B.  The Likely Payments to Subclass 2 Members ......................................6

IV.  THE COURT SHOULD GRANT FINAL APPROVAL OF THE
    PROPOSED SETTLEMENT ...........................................................................7

    A.  The Settlement Provides Significant Benefits to Class Members ......................8

    B.  The *Gascho* Factors Weigh in Favor of Granting Final Approval...................9

        1.  The Absence of Fraud or Collusion Supports Approving the
            Settlement Agreement ..............................................................9

        2.  The Complexity, Time, and Expense of Continued Litigation
            Against the Defendant Supports Approving the Settlement
            Agreement..............................................................................10

        3.  The Amount of Informal Discovery Engaged in by the Parties
            Supports Approving the Settlement Agreement ..................13

        4.  The Relief Obtained by the Settlement, Weighed Against the
            Likelihood of Success on the Merits, Supports Approving the
            Settlement Agreement ...........................................................15

        5.  The Opinions of Class Counsel and Class Representatives
            Support Approving the Settlement Agreement....................16

        6.  The Reaction of Absent Settlement Class Members Support
            Approving the Settlement Agreement....................................17

        7.  The Public Interest Supports Approving the Settlement
            Agreement..............................................................................19

V.  CONCLUSION……… ...................................................................................20

i

# <u>TABLE OF AUTHORITIES</u>

<u>Cases</u>

*Aboudi v. T-Mobile USA, Inc.*
  2015 WL 4923602 (S.D. Cal. Aug. 18, 2015) ........................................................................ 18

*Berry v. School Dist. of City of Benton Harbor*
  184 F.R.D. 93 (W.D. Mich. 1998) ......................................................................................... 10

*Blank v. Talley Industries, Inc.*
  64 F.R.D. 125 (S.D. N.Y. 1974) ............................................................................................ 16

*Churchill Vill., LLC v. Gen. Elec*
  361 F.3d 566 (9th Cir. 2004) ................................................................................................. 18

*Cotton v. Hinton*
  559 F.2d 1326 (5th Cir. 1977) ............................................................................................... 13

*Coulter-Owens v. Rodale, Inc.*
  2016 WL 5476490 (E.D. Mich. Sept. 29, 2016) .............................................................. 18, 20

*Fisher Brothers v. Phelps Dodge Industries Inc.*
  604 F.Supp. 446 (E.D. Pa. 1985) .......................................................................................... 16

*Gascho v. Glob. Fitness Holdings, LLC*
  822 F.3d 269 (6th Cir. 2016) ......................................................................................... passim

*Gilbert v. Abercrombie & Fitch, Co.*
  2016 WL 4159682 (S.D. Ohio Aug. 5, 2016) ........................................................................ 12

*GMAC Mortg. Corp. v. Stapleton*
  236 Ill.App.3d 486 (1st Dist. 1992) ....................................................................................... 17

*Goldsmith v. Tech. Solutions, Co.*
  1995 WL 17009594 (N.D. Ill. Oct. 10, 1995) .................................................................. 17-18

*Granada Investments, Inc. v. DWG Corp.*
  962 F.2d 1203 (6th Cir. 1992) ................................................................................................. 7

*Hainey v. Parrott*
  617 F.Supp.2d 668 (S.D. Ohio 2007) .................................................................................... 19

*In re AT & T Mobility Wireless Data Servs. Sales Tax Litig.*
  789 F. Supp. 2d 935 (N.D. Ill. 2011) ..................................................................................... 14

*In re Austrian & German Bank Holocaust Litig.*
  80 F.Supp.2d 164 (S.D.N.Y. 2000) ............................................................... 11, 12

*In re Cardizem CD Antitrust Litig.*
  218 F.R.D. 508 (E.D. Mich. 2003) ............................................................... 15, 19

*In re Elan Secs. Litig.*
  385 F. Supp. 2d 363 (S.D.N.Y. 2005) ............................................................... 14

*In re Jiffy Lube Sec. Litig.*
  927 F.2d 155 (4th Cir.1991) ............................................................... 13-14

*In re Mex. Money Transfer Litig.*
  164 F. Supp. 2d 1002 (N.D. Ill. 2000) ............................................................... 17

*In re Rio Hair Naturalizer Prod. Litig.*
  1996 WL 780512 (E.D. Mich. Dec. 20, 1996) ............................................................... 7

*In re Southern Ohio Correctional Facility*
  173 F.R.D. 205 (S.D. Ohio 1997) ............................................................... 7

*In re Sunrise Sec. Litig.*
  131 F.R.D. 450 (E.D. Pa. 1990) ............................................................... 13

*In re Telectronics Pacing Systems, Inc.*
  137 F.Supp.2d 985 (S.D. Ohio 2001) ............................................................... 7, 11

*Int'l Union v. Ford Motor Co.*
  2006 WL 1984363 (E.D. Mich. July 13, 2006) ............................................................... 9-10

*Int'l Union, United Auto., Aerospace, & Agric. Implement Workers of Am. v. Gen. Motors Corp.*
  497 F.3d 615, 631 (6th Cir. 2007) ............................................................... 9, 15

*IUE-CWA v. General Motors Corp.*
  238 F.R.D. 583 (E.D. Mich. 2006) ............................................................... 7, 10, 13-14

*Levell v. Monsanto Research Corp.*
  191 F.R.D. 543 (S.D. Ohio 2000) ............................................................... 13

*McBean v. City of New York*
  233 F.R.D. 377 (S.D.N.Y. 2006) ............................................................... 14

*Mees v. Skreened, Ltd.*
  2016 WL 67521 (S.D. Ohio, Jan. 6, 2016) ............................................................... 19

*Myszka v. National Collegiate Scouting Ass'n, Inc.*
  2014 WL 1364468 (N.D. Ill. Mar. 19, 2014) ........................................................ 18

*Newby v. Enron Corp.*
  394 F.3d 296 (5th Cir. 2004) .............................................................................. 13

*Olden v. LaFarge Corp.*
  472 F.Supp.2d 922 (E.D. Mich. 2007) ................................................................. 13

*Parker v. Anderson*
  667 F.2d 1204 (1982) ............................................................................................ 7

*Priddy v. Edelman*
  883 F.2d 438 (6th Cir. 1989) ............................................................................... 15

*Thacker v. Chesapeake Appalachia, L.L.C.*
  695 F.Supp.2d 521 (E.D. Ky. 2010) .................................................................... 10

*UAW v. General Motors Co.*
  2006 WL 891151 (Mar. 1, 2006) ..................................................................... 7, 13

*Weinberger v. Kendrick*
  698 F.2d 61 (2d Cir. 1982) .................................................................................. 13

## Other Authorities

*Federal Practice and Procedure: Civil 2d*
  (2d ed. 1986) ........................................................................................................ 7

*Manual for Complex Litigation*
  (3d ed.1995) ........................................................................................................... 7

*Manual for Complex Litigation*
  (4th ed. 2004) ........................................................................................................ 7

iv

Plaintiffs Stephanie Miller ("Miller") and Mary Alyce Dawson ("Dawson") (collectively, "Plaintiffs" or "Representative Plaintiffs"), individually, and on behalf of all others similarly situated, by and through counsel at the Zimmerman Law Offices, P.C. and the Dann Law Firm Co., LPA (collectively, "Class Counsel"), respectfully submit the following Motion for Final Approval of the Class Action Settlement Agreement ("Settlement" or "Settlement Agreement"), which this Court preliminarily approved on November 21, 2017.

## I.    NATURE OF THE LITIGATION AND PROCEDURAL HISTORY

This case arises out of Defendant Inteleos, Inc., f/k/a the American Registry for Diagnostic Sonography, Inc.'s ("Defendant" or "ARDMS") alleged mis-scoring of the Vascular Technology examination (the "Exam").   Many hospitals, doctor's offices, and healthcare organizations require that sonographers obtain a Registered Vascular Technologist ("RVT") credential by passing the Exam as a condition of employment.   During the time period from September 6, 2016 to March 14, 2017 (the "Class Period"), Plaintiffs and several other sonographers *passed* the Exam but erroneously received a failing score from Defendant.

Accordingly, on April 10, 2017, Plaintiffs brought this action for damages alleging that Defendant failed to properly administer and score the Exam.  (Dkt. #1).  Plaintiffs—individually and on behalf of nationwide Class—sought relief for breach of contract, negligence, violations of the Maryland Consumer Protection Act, MD Code, Commercial Law, §13-301 *et seq.,* violations of the Ohio Consumer Sales Practices Act, R.C. §1345.01 *et seq.,* violations of the Ohio Deceptive Trade Practices Act, R.C. §4165.01, and for unjust enrichment. (*Id.*)

After Plaintiffs filed their Complaint, Defendant began sending putative Class members communications in the form of a settlement check, along with a letter asserting that cashing the

check releases all of their claims.[1]  On April 27, 2017, Plaintiffs filed an *Ex Parte* Motion for Temporary Restraining Order (Dkt. #7) and Motion for Preliminary Injunction (Dkt. #8), barring Defendant from sending these communications to putative Class members. Plaintiffs alleged that the communications were misleading and contained inaccurate information as to all of the potential relief available to Class members. The Court denied Plaintiffs' motions. (Dkt. #11, 21). However, the Court directed that "any future blanket written communications to putative class members shall be drafted jointly." (Dkt. #21, p. 2). The Parties then agreed to let the process with the letters that were already sent by Defendant continue for approximately 60 days. *Id.*

On July 13, 2017, the Court held a case management conference and set the matter for mediation. In preparation for that mediation, the Parties engaged in preliminary settlement discussions, Plaintiffs provided Defendant with a settlement demand, Defendant responded, and the Parties filed a joint settlement report with the Court. The mediation conference was held with the Honorable Dan Aaron Polster on September 28, 2017, and the Court successfully mediated the Settlement Agreement.

On November 20, 2017, Plaintiffs filed their Amended Motion for Preliminary Approval, in which Plaintiffs set forth the terms of the Settlement, the plan of allocation of the Settlement Fund for Subclass 1 Members and Subclass 2 Members, and the Notice Plan.  (Dkt. #26).  On November 21, 2017, the Court granted preliminary approval of the Settlement Agreement. (Dkt. #27).  The Court found that the Settlement "resulted from arm's length negotiations conducted in good faith by the Parties[,]" "was reached voluntarily after consultation with experienced legal

---

[1] The letter states, among other things, that cashing the check constitutes an agreement that the putative Class member has been fully compensated for any injury, that the putative Class member fully releases and forever discharges Defendant from any liability in this case, and that by cashing the check, the putative Class member issues a blanket release as to "any fact and/or circumstance related in any way to the Vascular Technology (VT) exam(s) that you have taken and/or any incorrect scoring."

counsel[,]" and is "fair, reasonable, adequate, and within the range of possible final judicial approval." (*Id.*, ¶ 4).

On January 22, 2018, Plaintiffs filed their Motion for an Award of Attorneys' Fees, Litigation Expenses, and Service Awards ("Fee Petition") (Dkt. #29).  The Fee Petition, with attached declarations by Thomas A. Zimmerman, Jr. ("Zimmerman") (Dkt. #30) and Marc E. Dann ("Dann") (Dkt. #31), fully set forth the time and effort that Class Counsel and Representative Plaintiffs spent on this case.  (*Id.*).  Additionally, the Fee Petition described the Settlement's benefits to Settlement Class Members, the complex legal issues involved in this case, and the risk that continued litigation of this matter would place on Settlement Class Members. (*Id.*)  Plaintiffs hereby incorporate the arguments contained in the Fee Petition in support of their motion for final approval of the Settlement Agreement.

## II. SUMMARY OF THE SETTLEMENT

Under the terms of the Settlement, the Settling Parties agreed to certification of a Settlement Class for settlement purposes only, consisting of the following two (2) subclasses:

- "Subclass 1" means those Affected Exam Takers[2] who received an Initial Check(s) from ARDMS, but did not cash the Initial Check(s)[3] and did not request and did not receive additional compensation from ARDMS. (SA, § II. Definitions).

---

[2] "Affected Exam Takers" means the 403 exam takers who took one or more RVT exams administered by ARDMS from September 6, 2016 to March 14, 2017 and who, because of a process error, received a "failing score" when they had in fact passed the exam(s). (SA, § II. Definitions).

[3] "Initial Check," "Initial Checks," or "Initial Check(s)" means the $250, $500, or $750 checks, depending on how many times the Affected Exam Taker took the RVT exam(s), that were sent by ARDMS to Affected Exam Takers to cover the cost of the RVT exam(s) and the cost they paid to verify their score(s) and/or reimbursement for a practice exam(s). (SA, § II. Definitions).

- "Subclass 2" means those Affected Exam Takers who cashed the Initial Checks sent to them by ARDMS and who did not request or receive additional compensation. (SA, § II. Definitions).[4]

(SA § III.A).

The Settlement Agreement provides non-reversionary monetary benefits to both Subclass 1 and Subclass 2 Members.  Under the Settlement, the amount of Five-Hundred Seventy-Two Thousand Six-Hundred Forty-One Dollars and Zero Cents ($572,641) (hereinafter "Settlement Amount," "Settlement Payment" or "Settlement Funds") has been paid by ARDMS into an escrow account, to fully resolve and settle this Class Action Lawsuit. (SA § III.B).

Of the total Settlement Amount, $445,141 was allocated for distribution among Subclass 1 Members ("Subclass 1 Fund"), and $127,500 was allocated for distribution among Subclass 2 Members ("Subclass 2 Fund").  (SA § III.C).  Attorneys' fees, litigation costs, service awards to Representative Plaintiffs, and the costs of class notice and settlement administration will be deducted from the Subclass 1 Fund and Subclass 2 Fund proportionally. (SA §§ III.B, III.C). After deducting these costs, the Settlement 1 Fund shall be distributed to all Subclass 1 Members who submitted a valid claim form.  (SA § III.C(1)(a)).  Subclass 2 Members, on the other hand, need not submit a claim form and, instead, will directly receive a check from the Subclass 2 Fund.  (SA § III.C(2)).

---

[4] Excluded from the Settlement Class are: ARDMS and Inteleos, Inc., and their respective officers, directors, and employees, board members, affiliated, related companies, or entity that has a controlling interest in ARDMS or Inteleos, Inc., and all of their respective employees, agents, board members, affiliates, legal representatives, heirs, successors, or assigns, Class Counsel and their immediate family members, and the judge to whom this case is assigned and the judge's immediate family.  The Settlement Class also does not include any of the Affected Non-Settlement Class Members, who are defined as those Affected Exam Takers who asked for and received additional compensation above and beyond the sum of the Initial Check(s) to compensate them for losses, including, *inter alia*, exam fees and related expenses, lost wages, lost opportunities, time spent studying and study materials, and/or consequential damages and/or emotional harm. The Settlement Class also does not include the two individuals who may have been part of Subclass 2 and who signed a retainer agreement with Class Counsel, but previously entered into a separate agreement and Class Counsel represented at Mediation that they would be excluded. (Dkt. #27, ¶ 2).

## III.     THE RESULTS OF THE SETTLEMENT

On December 21, 2017, direct notice was disseminated to every Subclass 1 and Subclass 2 Member, both via post-card and email. *See* Declaration of Andrew Perry ("Perry Decl."), ¶¶ 6-10.

There were **no** objections filed by any Settlement Class Members. Perry Decl., ¶ 16. Of the 316 potential Settlement Class Members, only two (2) individuals submitted requests for exclusion from the Settlement, one from Subclass 1 and one from Subclass 2. *Id.*, ¶ 15.

### A.     The Likely Payments to Subclass 1 Members.

The Court-approved notice program proved to be incredibly effective at reaching Settlement Class Members. Of the sixty (60) Subclass 1 Members who did not opt-out of the Settlement, fifty two (52) of them submitted Claim Forms. *Id.*, ¶¶ 13-14. Indeed, the total claim-in rate for Subclass 1 Members *exceeded 85%*. Thus, the Notice Program, as designed and implemented, certainly constituted the best notice practicable under the circumstances, complies with Fed. R. Civ. P. 23(c), and satisfies due process requirements.

At this time, the Settlement Administrator cannot yet specify the exact monetary amounts Subclass 1 Members will receive because some Claim Forms from Subclass 1 Members contained deficiencies, which are still being resolved. Perry Decl., ¶¶ 19-21. The Settlement Administrator reasonably expected these deficiencies because of the customizable nature of the Subclass 1 claim form, as well as the option for Subclass 1 Members to submit supporting documentation and request relief exceeding the maximum amounts that could be obtained without having to submit any documentation. *Id.*, ¶ 18. On March 9, 2018, the Settlement Administrator mailed a Notice of Deficiency to each of the 26 Subclass 1 Members whose Claim Form contained a deficiency, and these Subclass 1 Members have until March 23, 2018 to

submit additional documentation in support of their claim.  *Id.*, ¶ 20.  Because the deficiency resolution process is ongoing, the Settlement Administrator cannot yet state the exact value of Subclass 1 Members' claims until after he has time to review the Subclass 1 Members' supplemental production.  *Id.*, ¶¶ 20-21.  However, based on the nature of the deficiencies, the Settlement Administrator can estimate which of these deficiencies can likely be cured and which can likely not be cured.  *Id.*, ¶ 21.

Based on the amount of deficiencies that the Settlement Administrator expects can likely be cured, the Settlement Administrator estimates that—after deducting attorneys' fees, litigation expenses, service awards to Representative Plaintiffs, and the costs of notice and administration of the Settlement—the average payout to each Subclass 1 Member will be between $5,000 and $6,000.[5]  Perry Decl., ¶ 22.

### B.    The Likely Payments to Subclass 2 Members.

After deducting attorneys' fees, litigation expenses, service awards to Representative Plaintiffs, and the costs of notice and administration of the Settlement, the Settlement Administrator further estimates that each Subclass 2 Member will be issued a check in the amount of $298.53.  Perry Decl., ¶ 17.  This is consistent with the Class Notice that advised Subclass 2 Members that the amount of their check "is estimated to be approximately $300." (Dkt. #26-1, pp. 73, 76, 83).

---

[5]  The Settlement Administrator's calculations are based on attorneys' fees, litigation expenses, and service awards to Representative Plaintiffs being awarded in the amounts requested in the Fee Petition, as amended by Zimmerman's supplemental declaration.  Perry Decl., ¶¶ 17, 22.  Plaintiffs hereby incorporate the arguments set forth in the Fee Petition (Dkt. #29), as well as Zimmerman's and Dann's supporting declarations (Dkt. #30, 31), and Zimmerman's supplemental declaration (Dkt. #35), that these requested amounts are reasonable.

## IV.    THE COURT SHOULD GRANT FINAL APPROVAL OF THE PROPOSED SETTLEMENT

"Being a preferred means of dispute resolution, there is a strong presumption by courts in favor of settlement." *In re Telectronics Pacing Systems, Inc.*, 137 F.Supp.2d 985, 1008-09 (S.D. Ohio 2001) (citing *In re Southern Ohio Correctional Facility,* 173 F.R.D. 205, 211 (S.D. Ohio 1997); *In re Rio Hair Naturalizer Prod. Litig.,* 1996 WL 780512, at *11 (E.D. Mich. Dec. 20, 1996); *Parker v. Anderson,* 667 F.2d 1204, 1209 (1982); *Manual for Complex Litigation,* § 30.42 (3d ed.1995). "To determine whether a proposed settlement is fair, reasonable, and adequate, the court must determine whether the interests of the class are better served by the settlement than by future litigation." *Manual for Complex Litigation (Fourth)*, § 21.61 (2004); *see also* Charles A. Wright, Arthur R. Miller & Mary K. Kane, *Federal Practice and Procedure: Civil 2d*, § 1797.1 (2d ed. 1986).

"Given that class settlements are favored, the role of the district court is 'limited to the extent necessary to reach a reasoned judgment that the agreement is not the product of fraud or overreaching by, or collusion between, the negotiating parties, and that the settlement, taken as a whole, is fair, reasonable and adequate to all concerned.'" *IUE-CWA v. General Motors Corp.*, 238 F.R.D. 583, 594 (E.D. Mich. 2006) (quoting *UAW v. General Motors Co.,* 2006 WL 891151, *13 (Mar. 1, 2006)); *see also* Wright & Miller, Federal Practice & Procedure § 1797.5 ("The role of the judge at the settlement hearing is strictly limited"). "Absent evidence of fraud or collusion, such settlements are not to be trifled with." *Granada Investments, Inc. v. DWG Corp.*, 962 F.2d 1203, 1205 (6th Cir. 1992).

Here, there has been no evidence—nor has there been an allegation—that the Settlement Agreement is the product of fraud or collusion, and the Court should approve the Settlement Agreement. As set forth herein, the Settlement Agreement is fair, reasonable, and adequate

because it provides significant monetary benefits to Settlement Class Members without the risks and burdens of continued litigation.  The positive results of the Settlement warrant that final approval should be granted.

**A.    The Settlement Provides Significant Benefits to Class Members.**

The Settlement Agreement provides Settlement Class Members with significant benefits. Specifically, the Settlement Administrator estimates that Subclass 1 Members who submitted a valid claim form will receive, on average, between $5,000 and $6,000 per claim, depending on the nature and extent of the expenses they sought in their customized Claim Form.  Perry Decl., ¶ 22.  This amount will compensate Subclass 1 Members for the economic damages that they sustained, such as Exam fees, score verification fees, study materials that they purchased to re-take the Exam, child care costs incurred while studying and re-taking an Exam, loss of employment, loss of a promotion, loss of a pay increase, travel expenses to re-take the Exam, lodging expenses to re-take the Exam, the time spent studying to re-take the Exam, and unreimbursed costs of counseling, therapy, or medical visits that Subclass 1 Members incurred as a result of the emotional distress caused by the mis-scoring of their Exam, plus compensation for their non-economic damages associated with the aggravation, harm to reputation, and emotional distress they experienced.

Subclass 2 Members—who have already been reimbursed by Defendant for every Exam fee, practice Exam fee, score verification fee, and any other fee that they paid to Defendant in connection with all RVT exams they took during the Class Period—will each receive a check in the amount of $298.53. Perry Decl., ¶ 17. Each of the 254 members who did not opt out of Subclass 2 will receive this monetary benefit without having to submit a claim form.  The checks will be mailed to Subclass 2 Members to the same address and in the same manner in which

Defendant previously mailed them checks to reimburse their Exam fees.  Because every Subclass 2 Member received and cashed their check from Defendant, Plaintiffs are confident that Subclass 2 Members will receive and cash their check from the Settlement, as well.  The Settlement Agreement provides these significant benefits to Subclass 2 Members despite Defendant's arguments that, by cashing the reimbursement checks that they previously received from Defendant, Subclass 2 Members released all of their claims against Defendant regarding the mis-scoring of their Exam.

As such, the Settlement Fund provides significant monetary benefits and compensation for Settlement Class Members.

**B.**      **The *Gascho* Factors Weigh in Favor of Granting Final Approval.**

In *Gascho*, the Sixth Circuit has held that seven (7) factors should "guide the court's inquiry" in determining whether a class action settlement should be approved: (1) "the risk of fraud or collusion;" (2) the "complexity, expense and likely duration of the litigation;" (3) the "amount of discovery engaged in by the parties;" (4) the "likelihood of success on the merits;" (5) the "opinions of class counsel and class representatives;" (6) the "reaction of absent class members;" and (7) "the public interest."  *Gascho v. Glob. Fitness Holdings, LLC*, 822 F.3d 269, 276-77 (6th Cir. 2016), *cert. denied sub nom* (quoting *Int'l Union, United Auto., Aerospace, & Agric. Implement Workers of Am. v. Gen. Motors Corp.,* 497 F.3d 615, 631 (6th Cir. 2007)). Here, all seven (7) *Gascho* factors support approving the Settlement.

**1.**      **The Absence of Fraud or Collusion Supports Approving the Settlement Agreement.**

The first factor that the Court should consider in determining whether to grant final approval of the Settlement is the risk of fraud or collusion.  *See Gascho*, 822 F.3d at 276-77. "Courts respect the integrity of counsel and presume the absence of fraud or collusion in

negotiating the settlement, unless evidence to the contrary is offered." *Int'l Union v. Ford Motor Co.*, 2006 WL 1984363, at *26 (E.D. Mich. July 13, 2006); *see also IUE*, 238 F.R.D. at 598 ("Courts presume the absence of fraud or collusion unless there is evidence to the contrary.").

Here, there has been ***no*** allegation of fraud or collusion against any of the Parties, and the absence of any such allegations supports approval of the Settlement Agreement.  *See Thacker v. Chesapeake Appalachia*, L.L.C., 695 F.Supp.2d 521, 531 (E.D. Ky. 2010) ("Throughout this litigation no allegation of fraud or collusion has ever been made against the parties.").  To the contrary, the Settlement Agreement was the result of arm's-length negotiations between the parties, informal discovery, and a formal mediation before the Honorable Dan Aaron Polster. The fact that the Settlement Agreement was reached during this formal mediation is evidence that the settlement is ***not*** the product of any fraud or collusion.  *See Gascho*, 822 F.3d at 277 (finding that a case's procedural history, including a "formal mediation session…weighed against the possibility of fraud or collusion.").  As such, the Court should find that the Settlement was not reached through any fraud or collusion, and this first factor weighs in favor of approving the Settlement Agreement.

## 2. The Complexity, Time, and Expense of Continued Litigation Against the Defendant Supports Approving the Settlement Agreement.

The second factor is the complexity, time, and expense of continued litigation against the Defendant.  *See Gascho*, 822 F.3d at 276-77.  "Although this factor requires 'some evaluation of the merits of the dispute, the district court must refrain from reaching conclusions upon issues which have not been fully litigated.'" (quoting *Berry v. School Dist. of City of Benton Harbor*, 184 F.R.D. 93, 98 (W.D. Mich. 1998)) (additional citations omitted).

No matter how meritorious a plaintiff's claim may be, "there is no such thing as risk-free, expense-free litigation."  *IUE-CWA*, 238 F.R.D. at 596.  "Generally speaking, '[m]ost class

actions are inherently complex and settlement avoids the costs, delays, and multitude of other problems associated with them.'" *In re Telectronics*, 137 F.Supp.2d at 1013 (quoting *In re Austrian & German Bank Holocaust Litig.,* 80 F.Supp.2d 164, 174 (S.D.N.Y. 2000)).  This case is no exception, as the litigation is significantly complex and presents many substantial risks and uncertainties that could have prevented any recovery whatsoever.  For example, ARDMS asserted 25 affirmative defenses to the Plaintiffs' Complaint.  (Dkt. #14, pp.16-20).  ARDMS also vigorously opposed Plaintiffs' motion for class certification, arguing that none of the prerequisites for class certification were satisfied. (*See* Dkt. #17).  Thus, there was a risk that class certification would not be granted.

With respect to Affected Exam Takers who did not request additional compensation from ARDMS and cashed the Initial Check that was sent to them by ARDMS (*i.e.*, the Subclass 2 Members), ARDMS argued that Affected Exam Takers had been explicitly advised that, by cashing the check, a putative class member would release all of his/her claims against ARDMS. (*See* Dkt. #18). Thus, there was substantial risk that a subclass comprised of those Affected Exam Takers would not be certified.

One particularly complex aspect of this litigation is the assessment of Settlement Class Members' damages.  Although all Settlement Class Members suffered the same kind of harm— *i.e.*, that they were erroneously told that they failed the Exam when, in fact, they passed the Exam—Subclass 1 Members suffered a variety of consequential damages ranging from losing their employment because they were believed to have failed the Exam, to spending money on study materials, child care costs, and travel expenses in order to re-take the Exam.  Additionally, Subclass 1 Members would have the difficult task of trying to quantify the damages associated with their resulting aggravation, harm to reputation, and emotional distress.

Although Plaintiffs and Class Counsel are confident that Settlement Class Members' economic and non-economic damages are the direct and proximate result of Defendant's failure to properly administer the Exam, calculating and quantifying these various damages would involve complex legal and factual analysis. It would be significantly burdensome for individual Subclass 1 Members to prove-up each of their individual damages at trial.

To contrast, the Settlement Agreement provides Subclass 1 Members with monetary compensation for these harms without the burden of having to prove-up their damages. Indeed, the average relief for Subclass 1 Members is expected to be $5,000-$6,000 per claim.

The Settlement Agreement delivers a real and substantial remedy to the Settlement Class without the risk or delay inherent in prosecuting Plaintiffs' claims against Defendant through summary judgment, determination of class certification, trial, and appeal. Settlement Class Members in both Subclass 1 and Subclass 2 will benefit by receiving immediate compensation under the Settlement Agreement, rather than undergoing years of burdensome and uncertain litigation. *See Gilbert v. Abercrombie & Fitch, Co.*, 2016 WL 4159682, at *9 (S.D. Ohio Aug. 5, 2016), *report and recommendation adopted,* 2016 WL 4449709 (S.D. Ohio Aug. 24, 2016) ("In the absence of a settlement, continued litigation would span years, requiring fact discovery, expert discovery, formal class certification, and other motion practice, including post-trial motions and appeals; that litigation would be both extensive and costly….Consideration of this factor therefore weighs in favor of approving the *Stipulation and Settlement Agreement*."); *In re Austrian and German Bank*, 80 F.Supp.2d at 174 (recognizing that "[m]ost class actions are inherently complex and settlement avoids the costs, delays, and multitude of other problems associated with them").

Thus, this factor favors final approval of the Settlement. *See Weinberger v. Kendrick*, 698 F.2d 61, 73 (2d Cir. 1982) ("There are weighty justifications, such as the reduction of litigation and related expenses, for the general policy favoring the settlement of litigation."); *In re Sunrise Sec. Litig.*, 131 F.R.D. 450, 455 (E.D. Pa. 1990) (approving a class action settlement because, in part, the settlement "will alleviate…the extraordinary complexity, expense and likely duration of this litigation").

### 3. The Amount of Informal Discovery Engaged in by the Parties Supports Approving the Settlement Agreement.

The third factor is the amount of discovery engaged in by the Parties. *See Gascho*, 822 F.3d at 276-77. Although the Parties did not conduct *formal* discovery in this case, "formal discovery methods certainly are not the only way to learn about the merits of a case." *Olden v. LaFarge Corp.*, 472 F.Supp.2d 922, 932 (E.D. Mich. 2007) (citing *Levell v. Monsanto Research Corp.,* 191 F.R.D. 543, 557 (S.D. Ohio 2000)); *see also Newby v. Enron Corp.,* 394 F.3d 296, 306 (5th Cir. 2004) ("'[F]ormal discovery [is not] a necessary ticket to the bargaining table.'") (internal citations omitted); *Cotton v. Hinton,* 559 F.2d 1326, 1332 (5th Cir. 1977) ("It is true that very little formal discovery was conducted and that there is no voluminous record in the case. However, the lack of such does not compel the conclusion that insufficient discovery was conducted."); *UAW*, 2006 WL 891151 at *19 ("[T]he absence of formal discovery is not unusual or problematic, so long as the parties and the court have adequate information in order to evaluate the relative positions of the parties.") (collecting cases).

A party's use of informal discovery to investigate the merits of a case "is not unusual or problematic, so long as they and the court have adequate information in order to evaluate the parties' relative positions." *IUE*, 238 F.R.D. at 598 (citing *In re Jiffy Lube Sec. Litig.,* 927 F.2d 155, 159 (4th Cir.1991) (finding that "documents filed by plaintiffs and evidence obtained

through informal discovery yielded sufficient undisputed facts" to evaluate the settlement)) (additional citations omitted).  Courts have explained that it does not matter whether the discovery is labelled "formal" or "informal;" instead "the pertinent inquiry is what facts and information have been provided." *In re AT & T Mobility Wireless Data Servs. Sales Tax Litig.,* 789 F. Supp. 2d 935, 967 (N.D. Ill. 2011); *see also McBean v. City of New York*, 233 F.R.D. 377, 384-85 (S.D.N.Y. 2006); *In re Elan Secs. Litig.*, 385 F. Supp. 2d 363, 370 (S.D.N.Y. 2005).

Here, the Parties conducted informal discovery throughout the settlement negotiations, wherein which they exchanged detailed information about the size and scope of the Class, as well as the types of damages that Class members were claiming. Defendant provided all of the pertinent information concerning each Class Member, including the dates they took the Exam, which Exams were mis-scored, and the amount of money they paid to Defendant for Exam fees. Defendant also provided Class Counsel with the categories of damages (*e.g.*, lost wages, child care expenses, etc.) and the amounts of money for each category that were submitted by Affected Non-Settlement Class Members who directly contacted Defendant to request additional compensation over and above the Initial Checks.  Class Counsel obtained similar damages information from Subclass 1 Members who contacted Class Counsel shortly after this case was filed.  Class Counsel tabulated the Class Members' actual damages information to compute the amount of the Settlement Fund, and fashion appropriate categories of damages and maximum recovery caps that could be sought by Subclass 1 Members without having to provide any supporting documentation.

Class Counsel were well-informed of the important facts and relevant legal issues when negotiating the Settlement.  Indeed, the Parties exchanged adequate information for Plaintiffs and Class Counsel to evaluate the Parties' relative positions, and this was presented to the Court

14

during the mediation. Accordingly, this factor favors also weighs in favor of approving the Settlement Agreement.

> ### 4. The Relief Obtained by the Settlement, Weighed Against the Likelihood of Success on the Merits, Supports Approving the Settlement Agreement.

The fourth factor is the likelihood of success on the merits weighed against the relief obtained by the settlement. *See Gascho*, 822 F.3d at 276-77; *see also Int'l Union, United Auto., Aerospace, and Agr. Implement Workers*, 497 F.3d 615 at 631 (recognizing that a court "cannot judge the fairness of a proposed compromise without weighing the plaintiff's likelihood of success on the merits against the amount and form of the relief offered in the settlement.") (internal quotation marks and citations omitted). This factor also weighs in favor of approving the Settlement Agreement.

Generally, class action settlements are favorable to courts because "[e]xperience proves that, no matter how confident trial counsel may be, they cannot predict with 100% accuracy a jury's favorable verdict[.]" *In re Cardizem CD Antitrust Litig.*, 218 F.R.D. 508, 523 (E.D. Mich. 2003). Therefore, settlements can still be fair, reasonable, adequate, and worthy of court approval when they do not provide the full relief that may be awarded at trial. *See Priddy v. Edelman*, 883 F.2d 438, 447 (6th Cir. 1989) ("The fact that the plaintiff might have received more if the case had been fully litigated is no reason not to approve the settlement.").

While Class Counsel is confident in the strength of Plaintiffs' and Settlement Class Members' claims, the aforementioned complex issues involved in this litigation—such as class certification, proving Subclass 1 Members' individual damages, and whether Subclass 2 Members released their claims by cashing the Initial Checks—posed a risk of no recovery whatsoever. As such, Settlement Class Members will benefit from receiving compensation

through the Settlement Agreement now without assuming the risks of trial and the burden of continued litigation.

    **5.**  **The Opinions of Class Counsel and Class Representatives Support Approving the Settlement Agreement.**

  The sixth factor is the opinions of Class Counsel and the Class Representatives.  *See Gascho*, 822 F.3d at 276-77.  Courts repeatedly and explicitly defer to the judgment of experienced counsel who have conducted arm's-length negotiations in approving proposed class settlements.  *See, e.g., Blank v. Talley Industries, Inc.*, 64 F.R.D. 125, 132 (S.D. N.Y. 1974) (recognizing that a factor "entitled to substantial weight is that the settlement bears the imprimatur of seasoned and experienced counsel"); *Fisher Brothers v. Phelps Dodge Industries Inc.*, 604 F.Supp. 446, 452 (E.D. Pa. 1985) (finding "the professional judgment of counsel involved in the litigation is entitled to great weight"); *see also Gascho*, 822 F.3d at 277 (finding the fact that "Class counsel and representatives approved the settlement agreement" weighed in favor of granting final approval).

  Zimmerman and Dann each submitted declarations in support of the Fee Petition, in which they describe their background, education, experience, credentials, and the caliber of their respective law firms.  (Dkt. #30, 31).  As fully set forth in the declarations, Class Counsel has extensive experience in consumer class actions and complex litigation, and their opinion regarding the fairness and adequacy of the Settlement is very credible.  Additionally, Class Counsel's opinion is supported by the amount of work that they spent investigating Plaintiffs' and Settlement Class Members' claims.  After arm's-length negotiations, including a formal mediation, the Parties reached an agreement that Class Counsel believes to be an excellent outcome for Settlement Class Members.  Class Counsel's opinion regarding the Settlement Agreement should be given significant weight with the Court.

Regarding the opinions of the Class Representatives, both Representative Plaintiffs submitted a valid Claim Form in approval of the relief provided to Settlement Class Members. In his declaration, Dann set forth the Representative Plaintiffs' extensive involvement in this litigation, including Dawson attending the initial status hearing and the mediation with the Court. (Dkt. #31, ¶¶ 28-37). As such, they have an adequate understanding of the strengths and weaknesses of their case, and the Court should give weight to their approval of the Settlement Agreement.

Therefore, the opinions of Class Counsel and Representative Plaintiffs support that the Settlement Agreement is a fair, reasonable, and adequate result for Settlement Class Members, and this factor weighs in favor of approving the Settlement Agreement.

### 6. The Reaction of Absent Settlement Class Members Support Approving the Settlement Agreement.

The sixth factor is the reaction of absent class members. *Gascho*, 822 F.3d at 276-77. Settlement Class Members have responded incredibly well to the Settlement Agreement. ***Over 85%*** of Subclass 1 Members submitted valid Claim Forms to receive their share of the Settlement. Perry Decl., ¶¶ 13-14.

***No*** Settlement Class Member objected to the Settlement, and only ***two*** Settlement Class Members (representing 0.6% of the Class) opted out of the Settlement. Perry Decl., ¶¶ 15-16. The absence of objections and minute number of opt-outs strongly supports the fairness and reasonableness of the Settlement here. *See, e.g., GMAC Mortg. Corp. v. Stapleton*, 236 Ill.App.3d 486, 497 (1st Dist. 1992) ("The fact that only 26 of 590,000 members elected to opt-out is testimony…that the class believes the settlement is fair."); *In re Mex. Money Transfer Litig.*, 164 F. Supp. 2d 1002, 1021 (N.D. Ill. 2000) (stating that acceptance rate of 99.9% of class members "is strong circumstantial evidence in favor of the settlements"); *Goldsmith v. Tech.*

*Solutions, Co*., 1995 WL 17009594, at *5 (N.D. Ill. Oct. 10, 1995) ("not a single objection to the proposed settlement has been received from any class member. Such a positive response to the settlement by the class is strong evidence the settlement is fair, reasonable and adequate, and should be approved.") (internal citations omitted.); *Myszka v. National Collegiate Scouting Ass'n, Inc*., 2014 WL 1364468, at *1 (N.D. Ill. Mar. 19, 2014) (finding that the complete lack of objections to the settlement supports final approval); *Aboudi v. T-Mobile USA, Inc*., 2015 WL 4923602, at *6 (S.D. Cal. Aug. 18, 2015) ("The reaction of Class Members can be characterized as positive. No objections have been filed, and there have been only 2 requests for exclusion."); *Chun-Hoon v. McKee Foods Corp.*, 716 F.Supp.2d 848, 852 (N.D. Cal. 2010) (finding that 4.86% opt-out rate strongly supported approval); *Churchill Vill., LLC v. Gen. Elec*, 361 F.3d 566, 577 (9th Cir. 2004) (approving a settlement with 500 opt-outs from a 90,000-person class, representing 0.56% of the class).

**Here, there was an acceptance rate of 99.4% of Settlement Class Members**.  The Court can easily infer that absent Settlement Class Members approve of the Settlement and its terms based on this tremendous response.  *See Coulter-Owens v. Rodale, Inc.*, 2016 WL 5476490, at *4 (E.D. Mich. Sept. 29, 2016) ("Absent class members have not given this court any reason to question the fairness of this settlement. None have lodged any objections with this court, and at the time of the motion's filing, only three had requested exclusion from the class.").

As such, the reaction of absent Settlement Class Members supports approving the Settlement Agreement.

### 7.    The Public Interest Supports Approving the Settlement Agreement.

The seventh and final factor for the Court's consideration is the public interest.  *See Gascho*, 822 F.3d at 276-77.  This factor similarly weighs in favor of approving the Settlement Agreement.

"[T]here is a strong public interest in encouraging settlement of complex litigation and class action suits because they are 'notoriously difficult and unpredictable' and settlement conserves judicial resources." *In re Cardizem CD*, 218 F.R.D. at 530; *see also Gascho*, 822 F.3d at 277 ("The public interest favored settlement because it provided an immediate cash payout to class members for their compensable injuries in an amount the court found to be fair, reasonable, and adequate, and because settlement would conserve judicial resources."); *Hainey v. Parrott*, 617 F.Supp.2d 668, 679 (S.D. Ohio 2007) ("Public policy generally favors settlement of class action lawsuits.").

This case is no exception, and the public interest is served by the Settlement Agreement. The Settlement provides significant monetary benefits to Settlement Class Members without the risks or burdens of continued litigation, and it conserves the resources of the Parties' and the Court.    Additionally, the public interest supports that Subclass 1 Members should be compensated for harms resulting from Defendant's mis-scoring of the Exam beyond the administrative fees that they paid to Defendant.  As such, awarding Subclass 1 Members an average of $5,000-$6,000 per claim for the consequential damages that they suffered serves the public interest.  *See Mees v. Skreened, Ltd.*, 2016 WL 67521, *4 (S.D. Ohio, Jan. 6, 2016) ("[T]he public interest is served by providing a certain monetary award to class members who had an unanticipated loss of employment and may have experienced financial hardship as a result.").

19

Further, the fact that no Settlement Class Member objected to the Settlement further supports that the public interest is in favor of the Settlement.  *See Coulter-Owens*, 2016 WL 5476490 at *4 ("Nothing in the record suggests a contrary public interest at play, and no class member has challenged the settlement.").

As such, all seven (7) *Gascho* factors weigh in favor of approving the Settlement Agreement.  The Settlement is fair, reasonable, and adequate, and the Court should grant final approval of the Settlement Agreement.

## V.    CONCLUSION

For all the reasons set forth above, Plaintiffs, individually and as representatives of the Settlement Class, request that the Court grant final approval of the Settlement Agreement, and for any other relief that the Court deems just under the circumstances (draft order attached hereto as Exhibit A).

Date: March 13, 2018                            Respectfully submitted,

                                                s/ Thomas A. Zimmerman, Jr.
                                                Thomas A. Zimmerman, Jr.
                                                (admitted *pro hac vice*)
                                                ZIMMERMAN LAW OFFICES, P.C.
                                                77 W. Washington Street, Suite 1220
                                                Chicago, Illinois 60602
                                                (312) 440-0020
                                                (312) 440-4180 (fax)
                                                *tom@attorneyzim.com*

                                                Marc E. Dann 0039425
                                                William C. Behrens 0093031
                                                THE DANN LAW FIRM CO., LPA
                                                P.O. Box. 6031040
                                                Cleveland, Ohio 44103
                                                (216) 373-0539
                                                (216) 373-0536 (fax)
                                                *notices@dannlaw.com*

                                                *Settlement Class Counsel*